Estate of W. E. Telling, Deceased, Claire J. Bonner, Administratrix, v. Commissioner.
Estate of Telling v. Commissioner
Docket No. 106694.
United States Tax Court
1944 Tax Ct. Memo LEXIS 194; 3 T.C.M. (CCH) 652; T.C.M. (RIA) 44222; June 28, 1944
*194 Jules Eshner, Esq., 1180 Union Commerce Bldg., Cleveland, Ohio, for the petitioner. Lawrence R. Bloomenthal, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding is for redetermination of a deficiency in income tax for the period January 26, 1938, to December 31, 1938, in the amount of $39,539.75. The petitioner assigns a number of errors in respondent's determination. The principal issue relates to the petitioner's cost basis for shares of the capital stock of S.M.A. Corporation. In the event the petitioner is sustained upon this issue, the remaining issues become academic. A stipulation of facts, with certain exhibits, was filed and oral testimony was presented. The stipulated facts are adopted as findings of fact. Others that appear hereinafter are found from the evidence. Findings of Fact The petitioner is the administratrix, de bonis non, of the Fstate of William E. Telling, who died January 26, 1938. The fiduciary income tax return for the period involved, January 26, 1938 to January 1, 1939, was filed with the collector of internal revenue for the eighteenth district of Ohio, at Cleveland, Ohio. Petitioner assumed this *195 administration after the resignation on February 16, 1938 of the Cleveland Trust Company, executor under decedent's last will and testament. The estate was insolvent to the extent of more than $1,000,000. The principal asset of the estate consisted of a block of 37,637 shares of the capital stock of the S.M.A. Corporation, Cleveland, Ohio, (hereinafter called "S.M.A."). All of these shares, at decedent's death, were pledged to banks as collateral to loans of decedent, his two daughters, Constance I. Telling and Gwendolyn H. Shuey, and one J. P. Wright. That corporation had been organized some years before by the decedent who, at his death, was president. At decedent's death the corporation had outstanding 212,394 shares of common stock which was its only stock. The principal business of the corporation was the manufacture and sale of baby food, in which it had a stable and growing market. It was also active in the development of special products such as carotene, biotin and nicotinic acid. Decedent, through his stock ownership, and that of the members of his family, his relatives and friends, controlled more than 50 per cent of the outstanding stock. Because of his involved financial *196 condition and a desire to liquidate his bank loans, so far as possible, early in 1937 decedent decided, if possible, to sell his stock in the company. With this in mind, on January 29 of that year decedent gave an option for 90 days on 65,000 shares of this stock to Mr. Fred Humphreys, at $25 per share. After assignment of this option to William Mericka & Co., brokers of Cleveland, Ohio, and as a result thereof, negotiations were opened with American Home Products Corporation of New York City, (hereinafter called "American"), for the sale of this stock. The latter corporation was a much larger corporation than the petitioner, the interests of which included the business in which S.M.A. was engaged. American was interested in the purchase of decedent's stock, because they desired to acquire the assets, business and good will of S.M.A., particularly their formulas for baby food. The negotiations continued throughout the remainder of 1937. The plan discussed was that S.M.A. should merge with American by American buying the business assets and good will of S.M.A. and paying therefor in common stock, which was the only issued stock, of American; that upon receipt of such stock S.M.A. *197 would distribute the same to its stockholders and dissolve. S.M.A. asked a rate of exchange of one share of American for each two shares of S.M.A. outstanding. On December 23, 1937, American, through a resolution of its Board of Directors, authorized its negotiators to effect the merger upon a basis of the exchange of 2.85 shares of S.M.A. for one share of American. Because of a desire to postpone the closing of the deal until 1938, nothing had been done during that year when decedent died. Two weeks later, the general counsel for S.M.A., participating in the negotiations, also died. As the result of these two deaths, negotiations were interrupted. On February 24, 1938 American, through a resolution of its Board of Directors, authorized its negotiators to reopen negotiations upon a basis of exchange of 2.75 shares of S.M.A. for one share of American. Including decedent's pledged S.M.A. stock, there was pledged in Cleveland banks, some of which had been closed, about 50 per cent of the outstanding stock of S.M.A. This fact, which the public knew, had a depressive effect on the S.M.A. stock on the Cleveland Stock Exchange, which was the only exchange upon which it was listed. These *198 banks were desirous of converting this collateral into American stock which was listed on the New York Stock Exchange and had a wider market. Because of this, and the deaths of the president and general counsel of S.M.A., American was financially able to and did close its negotiations with S.M.A. by the execution of a merger agreement as of May 20, 1938, under the terms of which American took over the assets and business of S.M.A., in exchange for one share of American for each three shares of S.M.A. then outstanding. This exchange occurred July 23, 1938. The total amount due for principal and interest at date of decedent's death, on account of the notes against which decedent's stock was pledged, exclusive of the J. P. Wright note, was $611,684.60. All of these pledged shares of the capital stock of S.M.A. Corporation were sold by the pledgees or exchanged for American stock which was then sold by the pledgees between July 25 and August 25, 1938 for an aggregate sum of $511,060.14, which sum was credited by the pledgees against the principal and interest of the loans secured thereby. S.M.A. earned per share in 1935, $.89 and in 1936 and 1937, $1.18. It paid dividends of 60 cents *199 per share in 1935, 97 1/2 cents in 1936 and $1 in 1937. The price range of S.M.A. on the Cleveland Stock Exchange during 1937 and January 1938 was as follows: Month
Shares
High
Low
1937 January
289
19
18
February
684
19
17
March
295
18 3/4
17 1/2
April
513
16 1/2
15
May
115
15 1/2
15
June
20
15
15
July
150
15
13 1/2
Aug.
35
13 1/4
12
Sept.
661
12 1/4
10
Oct.
438
11
10
Nov.
362
10 1/2
10
Dec.
743
12
10
1938 January
616
11
10 1/2
The range of prices of American on the New York Stock Exchange for the months of December 1937 to August 1938, inclusive, was as follows.. Month
Shares
High
Low
1937 December
13,000
37 1/4
33
1938 January
4,000
37 3/4
33 7/8
February
3,000
36 1/2
34 3/4
March
6,000
36 3/4
30 3/4
April
5,000
37 3/4
32
May
3,000
37
34
June
4,000
41
35 5/8
July
4,000
42 1/2
40
August
5,000
43 1/8
41
During the month of January 1938, 616 shares of S.M.A. stock were traded in on the Cleveland Exchange. During the entire year 1937, only 4,305 shares, or a monthly average of 359 shares of S.M.A., were bought and sold on that Exchange. The cost of S.M.A. assets to American was $2,982,365.75, *200 or $14.04 per share unit. Of this amount $1,350,193.07 was allocated by American to cost of the net tangible assets and $1,632,172.68 to intangibles and good will. These included a number of patents and formulas for baby food and were carried on the books of S.M.A. at $1, but which were very valuable. The public was not aware of the extent and value of these intangible assets. American would have been willing to pay S.M.A. as much in January as it did pay in July 1938 when the exchange was effected. The public did not know of the negotiations between American and S.M.A. preceding the merger of these companies. Because of petitioner's knowledge that decedent's estate was insolvent by such an amount as would make it practically immaterial for estate tax purposes as to the value at which the pledged S.M.A. stock of decedent was shown in the estate tax return, she fixed such value therein at $10 per share in accordance with her information that the list price on the stock exchange was the only figure that could be used. The fair market value of shares of S.M.A. on the date of decedent's death was $14 per share or a total value for the 37,637 shares of $526,918. The amount realized *201 on the disposition of the decedent's shares of S.M.A. stock was less than their fair market value on the date of his death. Opinion The decisive issue is the basis to the petitioner of 37,637 shares of S.M.A. stock. This involves the determination of the fair market value of these shares at the date of the decedent's death on January 26, 1938. In the fiduciary income tax return for the year 1938 these shares were valued at $10.50 per share. This is the mean unit value of the shares traded in on the Cleveland Stock Exchange during the month of January 1938. The petitioner now contends that their fair market value on the critical date was in excess of $14 per share. If the petitioner's position is sustained no taxable gain resulted when the shares were disposed of. The respondent argues that the unit price of the shares sold on the public exchange reflects the fair market value of each share of the large block of stock owned by decedent at his death. Undoubtedly, generally such a unit price ordinarily furnishes the best guide for valuing a block of stock. . This measure has been applied or justified even *202 where the block of stock to be valued was relatively large and the unit price on the exchange was established by trades in relatively few shares. ; ; . That unit price, however, is not necessarily controlling where special circumstances exist. ; ; ; . The size of a block of stock may be an influential factor. The fair market value with which we are concerned is that of a relatively large block of S.M.A. stock owned by decedent at his death. That question involves only a question of fact. . No cut and dried formula for determining this fact exists. All relevant circumstances must be considered. ; *203 . The petitioner offered the opinions of competent market observers. Principal emphasis, however, is laid upon the negotiations culminating in the merger of S.M.A. with American. On July 23, 1938 the latter acquired all the assets of the former by an exchange of their respective shares at a rate of 3 S.M.A. shares for one of American. For the 212,394 shares of S.M.A. outstanding, American issued 741,060 of its shares. The closing market price of American on the New York Stock Exchange, on July 23, 1938, was 42 1/8, thus giving to S.M.A. shares a unit value of $14.04. If the exchange date of July 23, 1938 be regarded as too remote from the critical date, the evidence establishes a value of $14 a share in the month of January, at the rate of exchange offered by American at that time. American shares sold in January 1938 at 37 3/4 and in December 1937 at 37 1/4, a mean of $37.50. American was willing in February 1938 to exchange their shares for S.M.A. shares at a rate of one for 2 3/4 shares. The price of $37.50 divided by the rate of 2 3/4 produces a resultant figure of $14. The testimony shows that in the early part *204 of 1937 certain interests connected with American were desirous of purchasing the large block of S.M.A. shares owned and controlled by the decedent, who was its president. At that time the price under consideration ranged between $19 and $22 per share. The S.M.A. shares were then selling on the open market at approximately $15. Later in the same year American became interested in a merger of the two companies whereby American would acquire all the assets of S.M.A. on a stock exchange basis. The decedent and the counsel representing S.M.A. were demanding a 2 to 1 rate of exchange. The representatives of American were offering to exchange 1 share of American for 2.85 shares of S.M.A. Practical agreement was reached at the latter rate and American proposed that a formal agreement be drawn. For tax reasons the S.M.A. representatives requested deferment until after the first of the year 1938. While the matter was temporarily suspended the decedent died. Within two weeks thereafter counsel for S.M.A. and one of its negotiators also passed on. In February 1938 negotiations were resumed and American's negotiators proposed a rate of one to 2 3/4. At the time of decedent's death all his stock *205 holdings in S.M.A. were pledged as collateral to loans outstanding with Cleveland banks. The decedent's estate was insolvent and the banks were pressing to have the merger effected. Thereupon American offered a rate of 1 for 3 which was approved by the stockholders of the respective companies. The evidence establishes that the net earnings of S.M.A. were improving. In 1935 it earned 89 cents per share to $1.18 in 1936 and 1937. In 1935 it paid a dividend of sixty cents, in 1936 $.97 1/2 and in 1937 it paid $1. Capitalizing its net earnings of $1.18 at an eight per cent return results in a valuation of $14.75 a share. Significant too is the fact that in addition to its baby food products S.M.A. was then active in developing certain vitamin sources. It also owned a considerable number of formulas and patents. These were carried upon its books at $1. However, upon the merger, American allocated as cost of the intangibles, including patents and good will, the sum of $1,632,172.68. At the time of decedent's death, the public was not generally aware of the existence of these valuable patents nor aware of the contemplated merger with American. Thus it is logical to assume that the intrinsic *206 value of S.M.A. shares was not reflected in the limited sales on the open market. In January 1938 only 616 shares of S.M.A. stock were traded in. In the entire year of 1937 the total sales on the market were only 4,305 shares, or a monthly average of 359. With 212,394 shares outstanding the monthly average market sales were less than 1/6 of 1 per cent. The large number of shares owned by the decedent and the large number over which he had control, coupled with his important relationship to S.M.A., had a tendency to increase rather than decrease the value of his shares under the special circumstances here disclosed. We do not think the unit price at which a limited number of shares sold on the market furnishes the proper criterion for determining the fair market value of decedent's block of S.M.A. stock. In our judgment the evidence reveals clearly that not only were decedent and other stockholders willing and even eager to sell but there was, in substance, a willing and able buyer for all the S.M.A. stock, including this very block of stock, during a period of several months immediately preceding as well as the period of some months after decedent's death. This buyer was actually *207 then negotiating for the exchange of this stock at a rate which would have given decedent, as well as all other S.M.A. stockholders, prices for their stock in excess of that reflected by the unit prices in limited market on the exchange. This exchange was actually consummated within six months of the critical date. See Regulations 80, art. 10. Considering all the pertinent factors and the special circumstances here shown, we find the fair market value of S.M.A. shares at the critical date to be $14 per share. The petitioner's cost basis is 37,637x $14 or a total of $526,918. The total amount credited by the pledgees against the decedent's indebtedness was $511,060.14 Hence no taxable capital gain resulted. Since there was no taxable gain on the transaction in which decedent's stock was disposed of, no deficiency would result if we sustained the respondent on each of the remaining contested issues. There is, therefore, no need to discuss and determine them. A decision of "no deficiency" will be entered